Argued July 29, decided Oct. 19, 1909. Modified on rehearing Feb. 15, 1910.

## STATE v. ROSS. *

[104 Pac. 596; 106 Pac. 1022.]

EMBEZZLEMENT — STATE FUNDS — DEPOSITS — OWNERSHIP — "SPECIAL DEPOSIT."

1. Laws 1907, p. 248, by Sections 1, 3, 5, 9, and 16, provides for the State Treasurer designating banks as State depositories for receiving funds of the State, excepting the educational fund, on deposit, and paying them out on order or checks of the State Treasurer, such deposits to draw interest, and the depositories to deposit securities or give bonds for payment of such deposits and interest. Sections 6, 7, and 8 provide for the State Treasurer designating banks as "active depositories" for the collection of drafts, checks, etc., that he may receive on account of any claim

---

This case has been appealed and is now pending in the United States Supreme Court.—REPORTER.

due the State, for such active depositories promptly making such collections, without charge, and notifying the State Treasurer of the collection, and depositing securities for such prompt collection, and for the safekeeping and prompt payment, on the State Treasurer's order, of such collections. Section 10 exempts the State Treasurer from liability for any moneys lost by failure or insolvency of a depository. Section 5, Article VIII, Constitution of Oregon, entrusts the investment of the educational fund to a board of commissioners. *Held,* that a deposit for collection and safe-keeping, of which nature a deposit of checks for the educational fund must be, is a "special deposit," title to which does not pass to the bank, as in the case of a general deposit, but remains in the State, so that the appropriation of such fund by a person having custody thereof is a larceny of State funds.

EMBEZZLEMENT—CONVERSION OF STATE MONEY—EVIDENCE OF RECEIPT OF MONEY.

2. Within Section 1807, B. & C. Comp., declaring guilty of larceny one who "receives any money" for the State and converts it to his own use, entry of credit to the State Treasurer on the books of a bank of the amount of checks which he deposited specially with it for collection and safe-keeping, is *prima facie* evidence that it received the money.

EMBEZZLEMENT—"CONVERSION" OF STATE MONEY.

3. There was a "conversion" within Section 1807, B. & C. Comp., declaring guilty of larceny one who receives money of the State and converts it, where money being deposited in a bank by the State Treasurer for safe-keeping was paid out to others than such Treasurer.

EMBEZZLEMENT—PERSONS LIABLE—CORPORATE OFFICERS.

4. Under Section 1807, B. & C. Comp., providing that if any person shall receive any money for the State, or shall have in his possession money belonging to the State, and shall convert it to his own use, he shall be guilty of larceny, where funds of the State are specially deposited with a corporation for safe-keeping, and the funds are used by it so as to constitute a conversion, its officers, by whose authority it is done, are guilty of the offense, as it can only have possession and act through them.

EMBEZZLEMENT—"CONVERT TO HIS OWN USE."

5. "Convert to his own use," within Section 1807, B. & C. Comp., providing that if any person shall receive any money for the State, or shall have in his possession money belonging to the State, and shall convert it to his own use, is equivalent to the term "conversion" in its legal sense; and it is enough to constitute it that one assumes to dispose of the property of another without right, as if it was his own, though he gets no personal benefit from it.

EMBEZZLEMENT—PERSONS LIABLE—CORPORATE OFFICERS—"PARTICIPATE."

6. Officers of a corporation "participate" in its conversion of State funds specially deposited with it for safe-keeping, so as to be guilty of larceny under Section 1807, B. & C. Comp., where the disposition of funds by the corporation is with their knowledge, consent, and acquiescence.

CRIMINAL LAW—HARMLESS ERROR—ADMISSION OF EVIDENCE.

7. It was not prejudicial, on the prosecution of the president of a bank, under Section 1807, B. & C. Comp., making it larceny for one, having in his possession money of the State, to convert it to his own use, to admit evidence tending to establish his knowledge of the terms of the statute providing for designation of banks as depositories of the State funds.

EMBEZZLEMENT—EVIDENCE—CONVERSION—DEMAND.

8. On a prosecution of officers of a bank for larceny, under Section 1807, B. & C. Comp., making it larceny for one, having funds of the State in his possession, to convert them to their own use, it being charged that they had the money in their possession as officers and directors of the bank, evidence of a demand on the bank for the money was competent.

EMBEZZLEMENT—CONVERSION—DEMAND.

9. A demand, in case of conversion, being necessary only where the conversion is not otherwise shown, it was not necessary, on a prosecution of officers of a bank for larceny, under Section 1807, B. & C. Comp., making it larceny for one, having State funds in his possession to convert them to his own use, to show a demand; the conversion being disclosed by evidence that money of the State deposited in the bank for safe-keeping was paid out on liabilities of the bank.

EMBEZZLEMENT—CRIMINAL INTENT—EVIDENCE.

10. Evidence, on a prosecution under Section 1807, B. & C. Comp., for larceny by conversion to the use of a bank of State funds deposited in it under Laws 1907, p. 248, for safe-keeping, that after the conversion the bank gave the State Treasurer collateral security, was immaterial on the question of criminal intent; such security being contemplated by the act under which the deposit was made, and not condoning the wrongful act.

EMBEZZLEMENT—CONVERSION OF MONEY OF THE STATE.

11. Officers of a bank are liable, under Section 1807, B. & C. Comp., making it larceny for any person, having in his possesison money belonging to the State, to convert it to his own use, though the money was lost through failure of a company with which the bank had dealings, as the money, being a special deposit with the bank for safe-keeping, should not have been involved in its dealings with others.

EMBEZZLEMENT—CONVERSION OF STATE FUNDS—CRIMINAL INTENT.

12. Criminal intent is not involved under Section 1807, B. & C. Comp., making it larceny for a person, having in his possession money belonging to the State, to convert it to his own use; but it is enough to constitute the offense that there was such a conversion.

CRIMINAL LAW—TRIAL—REMARKS BY JUDGE AND DISTRICT ATTORNEY.

13. For the district attorney, when cautioned by the court not to cross-examine his own witness, to state "I must invoke the rule in this case that the witness is an unwilling one" was proper, where the witness' conduct justified it. And for the court, when appealed to by the district attorney to be allowed to cross-examine his own witness, because he was an unwilling one, to rule in his favor by the remark "I see that the witness is unwilling" was not error, as any other form of ruling in favor of the cross-examination would have meant the same to the jury.

CRIMINAL LAW—CRUEL AND UNUSUAL PUNISHMENT.

14. A sentence for larceny was five years in the penitentiary, a fine of $577,000, and imprisonment in the county jail one day for each $2.00 of the fine till it was paid. Held, that the part as to imprisonment till payment of the fine, though within the maximum of the statute, was a cruel and unusual punishment within the prohibition of the constitution.

CRIMINAL LAW—APPEAL—MODIFICATION OF SENTENCE.

15. A sentence for larceny, which, unobjectionable so far as it provides for five years in the penitentiary and a fine of half a million dollars,

contravenes the provision of the constitution against cruel and unusual punishment, by providing for imprisonment in the county jail one day for each $2.00 of the fine till it is paid, will be modified on appeal, by reversal of the objectionable part and affirmance of the remainder.

EMBEZZLEMENT—STATUTES—RIGHTS OF DEPOSITORS.

16. When a bank mingles a "special deposit," authorized by the act of 1907 (Laws 1907, p. 248), with its own funds, such commingling will not deprive the owner of his rights, and it is still subject to the disposal of the depositor.

EMBEZZLEMENT—MINGLING SPECIAL DEPOSITS WITH GENERAL DEPOSIT.

17. Under Section 1807, B. & C. Comp., any person shall be deemed guilty of larceny, who receives any money whatever for the State, and shall in any way convert it to his own use, or shall loan any portion thereof, or shall refuse to pay over any portion thereof, when lawfully demanded. This section will authorize the prosecution for larceny of certain officers and directors of a bank who made arrangements with the State Treasurer to receive a "special deposit" (Laws 1907, p. 248), and permitted the same to he mingled with its general deposits, without placing any restrictions upon its use.

INDICTMENT AND INFORMATION—SUFFICIENCY—CRIME CHARGED.

18. An indictment is sufficient if it contains such specifications of acts and descriptive circumstances as will, upon its face, fix and determine its identity of the offense, and enable the court by an inspection of the record alone to determine whether, admitting the truth of the specific acts charged, a thing has been done which is forbidden by law.

INDICTMENT AND INFORMATION — STATUTES — CONSTITUTIONAL PRO VISIONS—CASES PENDING.

19. Section 18, Article VII, Constitution of Oregon, as amended June, 1908, providing that no person shall be charged in any circuit court with the commission of a crime, except upon indictment found by a grand jury, was prospective in operation only, and did not repeal Laws 1899, p. 99, authorizing the district attorney to proceed by information, etc., except to deprive the district attorney of the right to proceed by information thereafter and would not affect pending cases by information.

CRIMINAL LAW—CRUEL AND UNUSUAL PUNISHMENT.

20. A fine of $576,853.74 for larceny, which the defendant was unable to pay at the time, or even during a lifetime of effort, although within the maximum of the statute, was a cruel and unusual punishment within the prohibition of the constitution.

From Multnomah: GEORGE H. BURNETT, Judge.

Statement by MR. JUSTICE EAKIN.

This defendant, J. Thorburn Ross, is charged, by information, jointly with Geo. H. Hill, T. T. Burkhart, and John E. Aitchison, with the crime of larceny, committed in Multnomah County, Oregon, and upon change of venue the case was transferred to Marion County for trial. The substance of the charge is that on the 9th

day of September, 1907, the Title Guarantee & Trust
Company (hereafter referred to as the "Trust Com-
pany") was a corporation, carrying on a banking busi-
ness of which the defendants were directors, and J. T.
Ross, president, Geo. H. Hill, vice-president, T. T. Burk-
hart, treasurer, and that the defendants on that date, pre-
tending to act for said Trust Company, had in their
possession and control, for safe-keeping, as officers and
directors of the Trust Company, $288,426.87, belonging to
the State of Oregon, and being a part of the irreducible
school fund, agricultural college fund, and the university
fund (hereafter referred to as the "educational fund") ;
that defendants, well knowing that such money belonged
to that fund, did then and there willfully, unlawfully, and
feloniously convert the same to their own use, which
money, prior to that date, they—as officers and directors
of the Trust Company—had received for the State for
safe-keeping, from Geo. A. Steel, as State Treasurer.

The facts upon which the issues here arise are that
the Trust Company, since the year 1904, has been engaged
in banking, but not exclusively in such business; that
it had also prepared abstracts of title, written title insur-
ance, made mortgage loans, receiving compensation for
such services as a broker; that it had sold real estate on
commission, and performed other services for compensa-
tion; that on the 14th day of January, 1907, when Geo.
A. Steel took the office of State Treasurer, he had $400,-
000 of the State's money on deposit, subject to his check,
in various banks within the State. Of this sum $35,000
was deposited with the Trust Company. At that time
there was no segregation of the funds of the Treasurer,
as between the educational and general funds, except
on the books of the Treasurer, and such banks had not
been notified to which fund the deposits belonged. There-
after Steel continued the account with the Trust Com-
pany in the name of "Geo. A. Steel, State Treasurer,"

and deposits were made and checks drawn against the same from time to time, until the 3d day of June, 1907, at which time the Trust Company had been designated by the Treasurer as an active depository of the State, under the provision of section 6 of an act of the Legislative Assembly of the State of Oregon, adopted in the year 1907, providing for State depositories for State funds (Laws 1907, p. 248), at which time, evidently for the purpose of complying with the terms of such statute, Steel segregated the funds, and accordingly wrote to the Trust Company as follows:

"State of Oregon, Treasury Department.
"Salem, June 3, 1907.
"The Title Guarantee and Trust Company, Portland, Oregon—Gentlemen: I inclose herewith for credit of Geo. A. Steel, State Treasurer, Educational, the following checks:

No. 319, Geo. A. Steel, State Treasurer, on you ................................................................$272,449.02
No. 34, Geo. A. Steel, State Treasurer, on Ladd & Tilton ...............................................  2,600.00

Total ..............................................................$275,049.02
"Yours very truly, Geo. A. Steel,
"State Treasurer."

Thereupon, on the 5th day of June, 1907, an account was opened on the books of the Trust Company entitled, "Geo. A. Steel, Treasurer, Educational," the first item of which was the credit of the above amount, and thereafter, prior to November 6, 1907, the time of the appointment of the receiver for the Trust Company, many other credits were made in that account for checks sent by Steel for deposit therein, and on that day the balance to the credit of that account was $288,426.87. The remittances were all made in checks and drafts, except as above mentioned, and, except as stated, there was no evidence of possession of the money by defendants, or that the checks had been collected or converted into cash

by the Trust Company, or any one. Until the 20th day of August, 1907, the Trust Company always had on hand cash exceeding the balance due from it on the educational account, but on the next day it was about $300 less than such balance. This deficiency increased thereafter until November 6, 1907, when the Trust Company's cash on hand lacked $274,882.73 of being equal to the balance due on such account, and on that date all its cash was turned over to the receiver.

Defendant Ross testified that he did not convert to his own use any money whatever belonging to the educational fund of the State. When asked, "How much money did you get from the State of Oregon as deposited by the State Treasurer with the Trust Company?" his answer was, "I never received any money from the State of Oregon." A written demand was made by Steel, as Treasurer, on the Trust Company, for the amount of such account on November 12, 1907, service of which was accepted for the Trust Company by defendant Ross, as president. Steel testified that he did the business with the bank, and had no business with defendants; that he might have corresponded with Ross, but thought not; may have talked with him about depositing these funds, after the law took effect, but does not recollect. But the account was segregated, and he says he did have an arrangement or agreement with Burkhart, Ross, Aitchison, or Hill about the manner or arrangement by which these funds would be deposited in the bank, but did not think that Ross knew, at the time, any further than is disclosed by Steel's instructions at the office. He says he probably spoke to him, but does not remember any conversation. The principal dealings were with Ross or Burkhart. He further testifies that, pending the passage of the bill providing for depositories before the legislature of 1907, he probably consulted with Ross about it, and sent him copies of the bill.

The trial resulted in a verdict against the defendant of guilty, and a finding by the jury that the amount of money converted was $288,426.87. Thereafter defendant moved the court in arrest of judgment on the ground that the information does not state facts sufficient to constitute a crime, and also a motion for a new trial for insufficiency of the evidence to justify the verdict, and errors of law accruing at the trial, which motions were denied. Thereupon judgment was rendered against defendant that he be imprisoned in the penitentiary of the State of Oregon for the term of five years; that he be adjudged to pay a fine in the sum of $576,853.74; that he be imprisoned in the county jail of Multnomah County, Oregon, until such fine is paid, not exceeding 288,426 days; and that the State recover of and from the defendant its costs and disbursements. From this judgment defendant appeals.                                    AFFIRMED.

For appellant there was a brief with oral arguments by *Mr. Wallace McCamant, Mr. William P. Lord,* and *Mr. William Kaiser.*

For the State there was a brief over the names of *Mr. Andrew M. Crawford,* Attorney General, *Mr. George J. Cameron,* District Attorney, and *Mr. Martin L. Pipes,* with oral arguments by *Mr. Cameron* and *Mr. Pipes.*

MR. JUSTICE EAKIN delivered the opinion of the court.

1. The statute (B. & C. Comp.) upon which this prosecution is based provides:

"Sec. 1807. If any person shall receive any money whatever for this State * * or shall have in his possession any money whatever belonging to such State * * and shall in any way convert to his own use any portion thereof * * such person shall be deemed guilty of larceny. * * "

The first question for consideration relates to the character of the deposits made by the State Treasurer with the Trust Company, whether they were general or special,

and this depends on the terms of the statute of 1907, under which the deposits were made (Laws 1907, p. 248), which took effect May 26, 1907. The portions of the act applicable here are as follows:

"Section 1. It shall be the duty of the State Treasurer, on the first Monday in June of each year, to designate such banks and trust companies within this State, as he may, under the provisions of this act, deem eligible to be made State depositories, for the purpose of receiving on deposit funds of this State, and paying out the same on order or checks of the State Treasurer."

"Sec. 3. The State Treasurer shall deposit, and at all times keep on deposit in national banks doing business in the State of Oregon, or other banks and trust companies doing business within this State, as shall have been approved under the provisions of this act as herein provided, the amount of money in his hands belonging to the several funds in the State Treasury, and any such bank or trust company may file with the State Treasurer its application for the privilege of keeping on deposit such funds or some part thereof. All such deposits shall be subject to payment when demanded by the State Treasurer on his check, and any bank receiving· and holding any such deposit as aforesaid shall be required to pay and shall pay to the State for the privilege of holding the same, interest at the rate prescribed by the State Treasurer as hereinafter provided, which rate of interest shall not be less than two per cent per annum. * *

"Sec. 5. For the security of funds so deposited under the provisions of this act, the State Treasurer shall require all such depositories to deposit securities of the kind and character hereinafter described, or to give bonds for the payment of such deposits and the interest thereon. Said bonds, when given, shall run to the State of Oregon, and, together with the securities offered, are to be approved as to the legal form by the Attorney General. * * The bond provided for under this act shall be a surety company bond. * * [Here follows the form of bond to be given by a surety company.]"

"Sec. 9. The word 'bonds,' wherever used in this act, shall be held to include bonds furnished by surety companies authorized and qualified to do business in this

State. The word 'security' or 'securities' shall be construed to include United States bonds," etc.

"Sec. 16. The word 'funds' used in this act shall apply to all funds in the State Treasury except the common schools, agricultural college, and university funds. Nothing in this act shall be construed to deprive the State Land Board of the power to invest or dispose of the funds derived from the sale of public lands as is now or may be provided by law."

Thus it will be seen that the educational funds are excepted from the provisions of sections 1 to 5, inclusive. But sections 6, 7, and 8 include the educational fund, and provide as follows:

"Sec. 6. The State Treasurer may designate a bank or trust company in the City of Salem or a bank or trust company in the City of Portland as an active depository for the collection of any drafts, checks, certificates of deposit and coupons that may be received by him on account of any claim due the State.

"Sec. 7. The bank or trust company, designated as such active depository, shall be required to give security to the State to be approved by the State Treasurer for the prompt collection of all drafts, checks, certificates of deposit, coupons that may be delivered to such active depository by the State Treasurer` for collection; also, for the safe-keeping and prompt payment on the State Treasurer's order of all such collections, also for the payment of all drafts that may be issued to said State Treasurer by such active depository.

"Sec. 8. The State Treasurer, on receipt of any draft, check, or certificate of deposit, on account of State dues, may place the same in such active depository for collection, and it shall be the duty of such active depository to collect the same without delay, without charge for its services for such collection, or for exchange, and to notify the State Treasurer when collected. The compensation to be paid by such active depository shall be fixed by the State Treasurer upon the best terms obtainable for the State."

Section 10 contains the following clause:

"The State Treasurer shall not be liable personally or upon his official bond for any moneys that may be lost

by reason of the failure or insolvency of any bank which becomes a depository under this act."

The purpose of this statute is to secure to the State interest on State funds, and to provide depositories for State moneys. Of this act sections 1 to 5, inclusive, relate to the creation of depositories and payment of interest on money deposited, and applies to all State funds other than educational funds, but has no application to them. Sections 6, 7, and 8 provide for active depositories, and apply equally to the general and educational funds. It is evidently not the purpose of these sections that the active depositories shall loan or be required to pay interest on funds deposited thereunder, as section 5 provides for the security that shall be taken from general depositories, and if the active depositories could loan funds deposited therein, under the provisions of sections 6, 7, and 8, the effect would be to nullify the requirements of section 5 as to the character of the security to be given for the general deposits. The writer is unable to understand the purpose of the last clause of section 8, unless it is to give to the State the benefit of any deal that the Treasurer might be able to make for compensation. But whatever the intention, it cannot change the meaning of these sections.

Thus it appears that deposits, if they may be called such, in the active depositories, as provided in section 6, are made for an entirely different purpose than those provided for in section 3, and are only for a special purpose, namely, for the collection of the checks and drafts transmitted by the Treasurer, the safe-keeping and prompt payment of the money upon the Treasurer's order. For the security of funds of the general depositories the State Treasurer may require securities, such as United States, State, or municipal bonds, described in section 9, or a bond executed by a surety company, for which a form is prescribed and conditions specified. But

as to the security that may be required of an active depository, no specification is made or bond provided for, or other requirement, except that it must be such United States, State, or municipal bonds, specified in section 9 as shall be approved by the treasurer, and conditioned for the prompt collection of checks and drafts, for the safe-keeping of the money collected, and prompt payment thereof, on the treasurer's order. These are very different conditions from those provided by section 5 for general depositories. It is not in the power of the legislature to make provision for a loan or use of educational funds. Section 5, Article VIII, of the Constitution of Oregon, provides, that "the Governor, Secretary of State, and State Treasurer, shall constitute a Board of Commissioners for the sale of school and university lands, and for investment of funds arising therefrom." In the light of this constitutional provision, we can have no doubt as to the intention of the legislature in excluding educational funds from the operation of sections 1 to 5 of the act of 1907. The active depositories hold the money only as collections, and therefore the deposits were special, the title to which did not pass to the bank. *Multnomah County* v. *Oregon National Bank* (C. C.) 61 Fed. 912; *State ex rel.* v. *Thum,* 6 Idaho 323 (55 Pac. 858) ; *Sexton* v. *School Dist. No. 34 of Spokane County,* 9 Wash. 6 (36 Pac. 1052) ; *Merchants' Nat. Bank* v. *School Dist. No. 8,* 94 Fed. 705 (36 C. C. A. 432).

Counsel for defendant cite *Baker* v. *Williams' Banking Co.,* 42 Or. 213 (70 Pac. 711), as decisive of the rights of the treasurer to make a general deposit of the educational fund, but the question involved here did not arise in that case, and could not, as we are now controlled by the statute of 1907. The character of deposits must be determined by this statute. Section 11 makes it a felony for the treasurer to remove or deposit the State money except for lawful payments "or for the purpose of depositing

the same under the provisions of this act" in banks which shall have qualified as depositories, and this manner of deposit is exclusive. Both the Treasurer and the Trust Company in June, 1907, recognized and acted under this statute by creating the active depository and segregating the educational funds. Nebraska has a statute similar to Sections 1 to 5, inclusive, of this statute, but it does not except the educational funds, and in *State* v. *Bartley,* 39 Neb. 353 (58 N. W. 172: 23 L. R. A. 67), under a constitutional provision similar to ours, it is held that a deposit by the State Treasurer in such a depository is a loan, and that the statute is therefore void, in so far as it attempts to include educational funds. And in considering whether a deposit of the educational fund, under that law, might not be considered a deposit for safe-keeping, the court, referring to the contention of counsel for plaintiff to that effect, say: "This construction would be a reasonable and proper one, if the deposit contemplated by the statute was a special one, merely for safe-keeping, and that the same identical money should be returned. But this is not the kind of deposit the legislature meant." Our statute has gone further, and provided how the educational fund shall be deposited by excepting it from the general deposit authorized by Sections 1 to 5, and providing for the collection of checks and drafts, and the safe-keeping of money so collected, subject to the order of the Treasurer. This statute constitutes a part of the terms and conditions of the appointment of the depositories, and must be read into any arrangement made thereunder for deposits. *State* v. *Bartley,* 39 Neb. 353 (58 N. W. 172: 23 L. R. A. 67, 72); *Merchants' Nat. Bank* v. *School Dist. No. 8,* 94 Fed. 705 (36 C. C. A. 432) is very much in point upon this question, where it is said: "The bank had knowledge of the nature of the funds, and was chargeable with knowledge of the statute. * * The bank undertook to receive the

money as a trust fund for an express purpose, and for no other. It is immaterial that in the finding the deposit is designated a 'special deposit.' The true nature of the transaction is disclosed by the facts. The money was to be treated as the funds of the school district, and not as the funds of the bank, and, in the light of that understanding, it is clear that the bank had no right to commingle the money with other funds." Also *State* v. *Thum,* 6 Idaho, 323 (55 Pac. 858) is in point. It is there provided by statute that a deposit in a bank of State money, otherwise than on special deposit, shall be punished by imprisonment. It is held that this is authority to the Treasurer to make special deposits, and that upon such a deposit the bank had no authority to mingle or use the money so deposited.

2. Defendant further urges that the proof shows only a deposit and conversion of checks and drafts, and not money as charged in the indictment, and that this is a variance. The bill of exception shows that the Treasurer sent by mail to the Trust Company for collection checks and drafts. When these were paid by the banks on which they were drawn, the Trust Company thereby received the money for the credit of the Treasurer, and it is immaterial how they were paid. There is no suggestion in the record that the Trust Company did not receive the money. On the contrary, upon the receipt of the check "No. 319, Geo. A. Steel, Treasurer, upon you, $272,449.02," and check "No. 34, Geo. A. Steel, State Treasurer, on Ladd & Tilton, $2,600," the Trust Company opened an account on its books, entitled "Geo. A. Steel, Treasurer, Educational," and credited that account with a deposit of those amounts—$272,449.02. This is an acknowledgment that it received from itself and from Ladd & Tilton that amount of money for that account upon those checks. And the same is true of every other credit made, and constitutes at least *prima facie* proof of the receipt of the

money. In *State v. Neilon,* 43 Or. 168 (73 Pac. 321), defendant was prosecuted under this statute for the conversion of State money. The proof was that he received checks and drafts. Mr. Justice BEAN, in the opinion says:

"It is true that the bill of exceptions recites that there is no evidence as to what was done by the defendant with the checks and drafts; but, in the absence of a showing to the contrary, the jury were justified in finding that they were by the defendant converted into money on the presumption that the usual course of business was pursued. Section 788, subd. 26, B. & C. Comp."

Morse, Banks and Banking, Section 451, says:

"A credit given for the amount of a check by the bank upon which it is drawn is equivalent to, and will be treated as, a payment of a check. It is the same as if the money had been paid over the counter on the check, and then immediately paid back again to the account."

This language is quoted with approval in *Bartley* v. *State,* 53 Neb. 310, 338 (73 N. W. 744, 752) in a case where a similar question arose; and in *Merchants' Nat. Bank* v. *School Dist. No. 8,* 94 Fed. 705 (36 C. C. A. 432), the fund was held to be a trust fund and a special deposit, the title to which remained in the school district, though the deposit was made by checks, and the money not paid over the counter or segregated at the time, but placed to the credit of the district on the books of the bank.

3. When the Trust Company placed to the credit of "Steel, Treasurer, Educational," the amount of a check, it thereby acknowledged that it had received the amount of the check in money, and is at least *prima facie* sufficient to establish the receipt of the money by the Trust Company. Having decided that the money in the hands of the Trust Company was a special deposit, and the money remained the property of the State of Oregon, and was paid out to other persons than the State Treasurer, it follows that this was a conversion of the money.

4. It is contended, however, by defendant, that the proof does not substantiate the charge in the information that defendants were in the possession of the money of the State, but only that it was in possession of the Trust Company, and that the officers were not personally liable. But the language of the information is "that the defendants on the 9th day of September, 1907, then and there pretending to act for and on behalf of the Title Guarantee & Trust Company, did then and there have in their possession and under their control, as officers and directors of said Title Guarantee & Trust Company, as aforesaid, $288,426.87." The Trust Company is a corporation, an intangible thing, existing only in contemplation of law, a collection of individuals, authorized to act as if they were one. The individuals are its component parts, and the existence of a corporation independently of its stockholders is a fiction. Its rights and duties are the rights and duties of the persons composing it. 1 Morawetz, Corporation, § 1; 3 Thompson, Corporation, § 4009; 7 Thompson, Corporation, § 8140. Thompson says it has the capacity of acting by the collective vote or will of its component members. It can do no act not authorized by its stockholders or directors, and then only within its charter powers. Its head and hands are the head and hands of its directors and officers, and while it acts lawfully within its corporate powers, the natural and individual capacity and responsibility of its directors and its officers as to all matters respecting the object of the incorporation is totally extinct, and what is done is only by and for the corporation; the directors and officers are not individually liable for its acts. There may be acts for which the corporation will be held criminally liable, but not in any case in which intent is involved, or where the punishment is more than a fine, because other punishment cannot be enforced. However, if the officers and directors of a corporation join in a criminal act, as

a corporate act, they are jointly liable with the corporation, if it is an act for which the corporation may be prosecuted; and, if it is a felony, the directors and officers are individually liable. It is their criminal act, and not that of the corporation. 2 Morawetz, §§ 732, 733; *People* v. *Clark,* (O. & T.) 14 N. Y. Supp. 642; *People* v. *White Lead Works,* 82 Mich. 471 (46 N. W. 735: 9 L. R. A. 722). In the latter case the officers were jointly indicted with the corporation for violation of a municipal ordinance and the Supreme Court say:

"All the defendants were properly convicted. As officers of a company, they were jointly responsible for the business. It is not necessary to the conviction that they should be actually engaged in work upon the premises. The work is carried on by employees. The officers and directors are the persons responsible, and therefore the proper ones to be prosecuted."

To the same effect is *State.* v. *Great Works Milling & Man. Co.,* 20 Me. 41 (37 Am. Dec. 38).

Defendant contends that section 1807, B. & C. Comp., is only intended to punish persons who are authorized by law to receive money for the State, or into whose hands it comes lawfully, and who convert it, and that Ross was not individually authorized to receive the money. Under the act of 1907 the Trust Company was made an active depository, and therefore authorized to receive it. This it could only do by the hands of its officers; and, if it was a violation of the statute for the Trust Company to convert the money, it was equally so for any one who did the act for it, or authorized it. The money came into the hands of these defendants, as officers of the Trust Company, lawfully, by virtue of this statute, and they cannot be permitted to say that what they did in violation of the statute was not their act, and that therefore they are not responsible. If the acts were done in the name of the corporation by the defendants, then they were accessories, and aided and abetted, and

are principals under Sections 1324, 2153, B. & C. Comp.; 3 Thompson, Corporations, § 4114; 4 Thompson, Corporations, § 4996; 21 Am. & Eng. Enc. Law (2 ed.) 896; *State* v. *Moran*, 15 Or. 262 (14 Pac. 419); *State* v. *Steeves*, 29 Or. 85 (43 Pac. 947). Thompson, Corporations (volume 3, § 4014) says:

"It is the duty of the directors and other officers of a corporation to preserve its property as a trust fund of which they are the guardians, and to administer it for the purposes of the trust."

And at section 4113 he says:

"In a moral sense they are the custodians of the funds committed to their care by the stockholders and the depositors."

These two sections are only discussing their civil responsibility, but it indicates their relation to the funds, and we conclude that the directors and officers of the bank, who used or authorized the use of the money by the Trust Company, are guilty under this statute.

5. Counsel for defendant also urge that the evidence does not tend to establish a conversion of the money by defendant to his own use, namely, that it is not sufficient to show that the funds were converted for the benefit of the Trust Company, but must have been to the personal advantage of defendant. We do not so understand the law of conversion. The statute uses the expression "shall in any way convert to his own use any portion thereof." That is what we understand the term "conversion" to mean, when applied to a wrongful appropriation for which trover will lie, namely, assuming upon one's self the property and right to dispose of another's goods without authority. The cases of *Mills* v. *State*, 53 Neb. 263, 271 (73 N. W. 761) and *State* v. *Foust*, 114 N. C. 842 (19 S. E. 275) cited by defendant as making a distinction between conversion to one's own use and to the use of another, both intimate that the term quoted

may not include a misappropriation. But the Nebraska statute includes both forms of expression "convert to his own use or to the use of another." Therefore it might be held that the legislature meant to limit the meaning of the former. But both of these cases are decided upon the term "embezzled," and not upon the expression "convert to his own use." The opinions in some civil cases, in defining what constitutes conversion say that it is not necessary that the conversion be to the use of the convertor. But the term "conversion," as used in law courts, means "conversion to one's own use." Johnson's Universal Cyc. says conversion in law has two meanings. "(2) In the law courts * * conversion lies at the foundation of the common-law action of trover, which word is derived from the French word 'trover'—to find. There is a legal fiction that the defendant found the plaintiff's property and converted it to his own use. The material part of the case is the conversion." 1 Chitty, Pleading, 145, says: "The action of trover or conversion was, in its origin, an action of trespass on the case for the recovery of damages against a person who had found goods and refused to deliver them on demand to the owner, but converted them to his own use." Lord Mansfield says: "In form it [trover] is a fiction; in substance it is a remedy to recover the value of personal chattels wrongfully converted by another to his own use." 1 Chitty, Pld. 146. In 3 Enc. Laws of Eng., 360, the same language is used in defining the origin and meaning of the term "conversion," namely, as conversion to one's own use and the averment of "finding," being only a fiction, has been dropped, and the action is now known as "conversion."

We find no decision or text-book, nor is any cited by defendant, that attempts to define the meaning of the term "convert to his own use" when used in a criminal statute. Such conversion does not, in itself, constitute

a crime.    The definitions in the dictionaries and text-
books relate to acts that constitute a conversion for which
trover will lie.    A conversion, in the ordinary sense of
the word, may be accomplished by one lawfully in posses-
sion of goods of another, when the conversion is by
authority and for the benefit of the owner, and this
creates no liability.    But when used in its legal sense,
the conversion must be for one's own use.    In *Baldwin* v.
*Cole,* 6 Mod. *212, Lord Holt says:

"What is a conversion but an assuming upon one's self
the property and right of disposing of another's goods,
and he that takes upon himself to detain another man's
goods from him, without cause, takes upon himself the
right of disposing of them."

"An appropriation of, and dealing with, the property
of another as if it were one's own, without right."    Web-
ster.    Under the heading, "Appropriation to Convertor's
Use" (2 Words & Phrases, 1564) it is said: "Any direct
act of dominion, wrongfully exercised over one's property
in denial of his right or inconsistent with it, is a con-
version"—citing many authorities.    See 9 Bacon's Abr.
631.    To the same effect is the definition given by Mr.
Justice LORD in the opinion in *Budd* v. *Multnomah St.
Ry. Co.,* 12 Or. 271 (7 Pac. 99: 53 Am. Rep. 355).
*Fowler* v. *Hollins,* 41 L. J. (1872) 277, is a leading Eng-
lish case on this subject, and the court, in the opinion,
uses the word "convert" as the equivalent of "convert to
his own use."    See, also, a leading article in 13 Cent.
Law J. 185, copied from Solicitor's Journal, London.
*West Jersey R. R. Co.* v. *Trenton Car Works Co.,* 32 N. J.
Law, 517.    The term "convert to his own use" is not
descriptive of crime, but is used in criminal statutes as
a legal term with a definite meaning, well understood,
and is equivalent to the legal term "conversion," and this
is the "conversion to his own use" of our criminal stat-
ute, which declares that such a conversion of state money,

by one who has received it for the state, shall constitute larceny.

We have six criminal statutes that make conversion of personal property of another "to one's own use" a crime; and, if it be necessary for the State to prove that the conversion is for the personal advantage of the defendant, there would be a failure of justice in many cases. Every assuming by one person to dispose of the goods of another, without right, as if they were his own is a conversion to one's own use. This is not extending the statute by inference or construction, but giving to the words the technical meaning they bear in the law. *Laverty* v. *Snethen*, 68 N. Y. 522 (23 Am. Rep. 184), makes the distinction between conversion to the use of the owner and to one's own use, and says:

"Trover may be maintained when the agent has wrongfully converted the property of his principal to his own use, and the fact of conversion may be made out by showing either a demand and refusal, or that the agent has, without necessity, sold or otherwise disposed of the property contrary to his instructions. * * If the agent parts with the property in a way or for a purpose not authorized, he is liable for a conversion."

We understand from these authorities, and many others we have examined, that, in relation to trover, the term "conversion" necessarily means conversion to one's own use, and is fully accomplished by any exercise of a dominion over a chattel without the authority of the owner, whereby the true owner is deprived of the enjoyment of his chattel. And it is wholly immaterial whether the person so converting did it for his own personal advantage or not. See, also, *State* v. *Omaha Nat. Bank*, 59 Neb. 483 (81 N. W. 319).

6. One other question remains. Does the evidence tend to show that Ross, as a director or president, participated in, or was a party to, the conversion? "Officers, directors, and agents of a corporation, participating in a viola-

tion of law in the conduct of the company's business may
be held criminally liable therefor." 21 Am. & Eng. Enc.
Law (2 ed.) 896. We think there can be no question of
the correctness of this statement. It is equally true that
an officer of a corporation is not criminally liable for the
unlawful act of the corporation unless he participated
in the wrongful act. In *Rex* v. *Hays,* 14 Ont. L. R. 201,
it is said that, "in the absence of a statute to the contrary,
an officer of a corporation cannot be punished criminally
for the corporation's unlawful act or default, unless he
participates therein as an aider, abettor, or accessory,
even though the corporation's defense consists of the vio-
lation of a statute which imposes imprisonment as a pen-
alty." There is a note to this case in 8 Am. & Eng. Ann.
Cas. 383, in which the author says: "The question of the
criminal liability of the officers of a corporation for its
acts of nonfeasance seems seldom to have arisen. The
weight of modern authority * * is apparently as laid
down in the reported case, viz., that an officer of a cor-
poration is not liable for an offense committed by the cor-
poration, except where he has in some way participated
in the illegal act as an aider, abettor, or accessory"—
citing several cases to that effect. 3 Thompson, Corpora-
tions, § 4114, citing *People* v. *Clark* (O. & T.) 14 N. Y.
Supp. 642, is to the same effect. There is no evidence in
this transcript tending to show that Ross actually paid
out for the Trust Company any of its money, or expressly
authorized any one to do so. There is no doubt that if
the money had been embezzled from the Trust Company,
or applied in any way not intended by the company, or
not for its benefit, by any subordinate, then Ross could
not be held criminally liable, unless he participated in
such diversion thereof, but that is not this case. The
record tends to show that the money was in the general
deposit funds of the Trust Company, and was paid out
in the usual way in payment of legitimate claims against

the Trust Company; that is, in the manner contemplated and intended by the company, and those in direction of its affairs. The agents actually paying out the money had a right to understand that this was to be done; there being no segregation of the money or limitation on the use of it. The Trust Company could only become an active depository of this fund by authority of its officers and board of directors. When the money was received by the company as an active depository, and its directors and officers permitted the money to become a part of the general deposit of the company, without restriction thereon, with knowledge that in so doing the money would be applied to the Trust Company's general uses, this was general authority to subordinates to pay it out in the usual course of the business, and these officers and directors are liable therefor. The evidence tends to show that the disposition of the money by the Trust Company was with their knowledge, consent, and acquiescence, and they thereby participated in its diversion. To this effect is 4 Thompson, Corporations, § 4996.

This disposes of the principal questions involved. There are some minor questions raised, namely:

7. Exception was taken to the admission of evidence relating to Ross' knowledge of the bill pending before the legislature of 1907, which authorized the appointment of depositories. This evidence only tended to establish Ross' knowledge of the statute and its terms, and was not prejudicial.

8. Exception was taken to the admission in evidence of the demand made upon the Trust Company. This we think was competent and consistent with the charge in the information that defendants had the money in their control as officers and directors of the Trust Company, and a demand upon the Trust Company for which the defendants were acting was sufficient.

9. However, a demand, in case of conversion, is only

necessary in case the conversion is not otherwise made to appear. Here the conversion was disclosed by proof that the money was paid out on liabilities of the Trust Company.

10. The proof offered by defendant to show absence of criminal intent was immaterial, as it only tended to show that, after the money was converted, the Trust Company gave the Treasurer collateral security. Such security is contemplated in the act of 1907, and when given did not condone the wrongful act.

11. The proof of loss through failure of the Oregon Trust & Savings Bank was incompetent, as the money— being a special deposit—should not have been involved in the dealings between the Trust Company and its creditors.

12. Neither is criminal intent involved under this statute, as we have shown in defining a conversion. Such a conversion, when committed in violation of the terms of this statute (Section 1807), constitutes the offense, and no other intent need be shown.

13. Exception was also taken to remarks made by the district attorney and the judge, in presence of the jury, in permitting leading questions by the State to its own witness. · When the district attorney was cautioned by the court not to cross-examine his own witness, he appealed to the court as follows: "I must invoke the rule in this case that. the witness is an unwilling one"— to which the court replied, "I see that the witness is unwilling." Certainly the district attorney had a right to make such an appeal to the court if the conduct of the witness justified it, and any form of ruling by the court allowing the attorney's question would have meant the same to the jury, as the language used, and was not error.

14. Exception is also taken to the portion of the judgment that commits defendant to the county jail until

the fine is paid, for the reason that the same is cruel and unusual under the prohibition of the constitution. Defendant was sentenced to five years in the penitentiary, to pay a fine of $576,853.74, and to be imprisoned in the county jail one day for every $2.00 of the fine, not exceeding 288,426 days. This is an unusually large fine, and the imprisonment is for life, for the nonpayment of the fine, and is a cruel and unusual punishment within the prohibition of the constitution. *State* v. *Miller,* 75 N. C. 73; *State* v. *Driver,* 78 N. C. 423; *Frese* v. *State,* 23 Fla. 267 (2 South. 1) ; *In re Yell,* 107 Mich. 228 (65 N. W. 97) ; *Southern Express Co.* v. *Walker,* 92 Va. 59 (22 S. E. 809: 41 L. R. A. 436) ; *State* v. *Whitaker,* 48 La. An. 527 (19 South. 457: 35 L. R. A. 561).

15. There can be no question that a sentence may be excessive, even though within the maximum of the statute, but if excessive, it is within the power of the appellate court to enforce this provision of the Bill of Rights, and avoid the judgment so far as it is excessive. *Mims* v. *State,* 26 Minn. 494 (5 N. W. 369) ; *Southern Express Co.* v. *Walker,* 92 Va. 59 (22 S. E. 809: 41 L. R. A. 436) ; *Frese* v. *State,* 23 Fla. 267 (2 South. 1) ; *State* v. *Butman,* 15 La. An. 166. And the judgment and sentence of the lower court will be modified by reversing that part directing that "he be imprisoned in the county jail of Multnomah County, Oregon, until said fine is paid, not exceeding 288,426 days." In all other respects the judgment is affirmed.        MODIFIED: AFFIRMED.

[Decided February 15, 1910.]

## ON MOTION FOR REHEARING.

[106 Pac. 1022.]

MR. JUSTICE EAKIN delivered the opinion of the court.

MR. JUSTICE KING dissenting.

16. A petition for rehearing has been filed in this case by counsel for defendant, another by Carey & Kerr, on

the ground that they are employed in cases involving
some of the same questions, and another by Joseph Simon
and twenty other leading members of the bar, solely as
*amicus curiae,* on account of the public importance of the
decision. The ground upon which the motion is based
is error of this court in the application of the law to this
case as disclosed in the opinion, and is principally a
review of the questions discussed therein.

Counsel for defendant and Carey & Kerr insist that
the act of 1907 (Laws 1907, p. 248), has no application
to the educational fund, and that the Treasurer has the
right to make general deposits of that fund in any bank,
as held in *Baker* v. *Williams,* 42 Or. 223 (70 Pac. 711),
independent of that act, while it is contended in the
petition of Joseph Simon *et al.,* that by sections 6, 7, and
8 of the late law a general deposit of that fund in the
active depository is authorized. We have re-examined
the questions involved with the aid of the briefs sub-
mitted with these applications, and adhere to our first
views. Sections 1 to 5 make provision for deposits, clearly
contemplating that the deposits shall be general, and
requiring the Treasurer to deposit all State funds, except
the educational fund, in the general depositories. The
collections made by the active depository upon checks
and drafts for the general funds cannot be left there by
the Treasurer, but must be transferred to the general
depositories. This obligation is as binding on him as
that he shall not retain the money in his office. Instead
of exempting the educational funds from the terms of
the act, section 16 provides that the term "funds," as
used in the act, shall not include the educational funds,
and that nothing in the act shall be construed to deprive
the State Land Board of power over this fund, thus indi-
cating that it is to be governed by the provisions of the
act, save where it is excepted therefrom, and sections
6, 7, and 8 seem to have special reference to the educa-

tional fund. The decision in *Baker* v. *Williams,* 42 Or. 223 (70 Pac. 711) is not here questioned. No doubt the legislature had that decision in mind when it adopted the present law, seeking thereby to guard the educational fund by expressly excluding it from a general deposit. Section 6 is not uncertain as to what funds may be collected thereunder when it says that it is for the collection of any drafts, checks, and certificates that may be received by the Treasurer "on account of any claim due the State." Sections 3 and 4 fix the minimum rate of interest to be paid by the general depository, and provide that the rate agreed upon shall not be changed for a year, and shall be computed on daily balance and paid quarterly, and that the bank shall render an account the first of every month, showing daily balances. And the condition of the security given is that all of these things shall be done, while the security required under section 7 is conditioned only for the prompt collection, the safe-keeping, and the prompt payment on the Treasurer's orders of the proceeds of such collections and for the prompt payment of its own drafts. This does not include statements, nor contemplate interest. The conclusion is un-avoidable that this act only contemplates general deposits of funds other than the educational, and for which interest shall be paid. It was evidently the purpose of the legislature by these provisions to take the educational fund out of that custom or right of the Treasurer to make general deposits as recognized in *Baker* v. *Williams,* 42 Or. 223 (70 Pac. 711). The clause in section 8, to the effect that the compensation to be paid shall be fixed by the Treasurer, does not require him to exact a compensation as a condition for the deposit nor is such requirement made a condition upon which the bank shall be appointed an active depository. In the opinion we cited some cases holding that in case of a special deposit the money may not be mingled by the bank with its own funds, yet we did not

intend to decide that question, deeming it unnecessary since the conversion was proved independent of such commingling; but the fact that the bank does so mingle a special deposit cannot deprive the owner of his rights as such. *Woodhouse* v. *Crandall,* 197 Ill. 104 (64 N. E. 292: 58 L. R. A. 385). It is not held in the opinion that the trust company or the defendants were officers of the State, but the act of 1907 authorizes their possession of State money for the State, and they come fully within the class of persons mentioned in Section 1807, B. & C. Comp., which includes more than State or municipal officers, viz., "any person who shall receive any money whatever for this State." When the Treasurer deposits the money, as directed by the act of 1907, his personal liability therefor is terminated, although it is still subject to his disposal. The depository does not receive the money for him, but for the State; that is, by express direction of the law and not at the option of the Treasurer.. The Trust Company and defendants did receive this money for the State by special authorization, and are as clearly within the very words of the statute as the Treasurer would be.

17. Section 1805, B. & C. Comp., defining embezzlement relates to the fraudulent conversion by an officer, agent, or clerk of a private person or incorporation, and does not apply to one in possession of public money, and Section 1807 relates especially to public moneys that are misappropriated. This is not a case where some other officer converted the money and defendant is held responsible for that act by reason of his relation to the bank. There is nothing in the record to disclose that any other officer wrongfully converted the money. The cashier or teller who paid out the money was not offender, unless he was aware of the source from which the money came and the capacity in which it was held. The wrongful act was done by the officers and directors who made the

arrangement to receive the special deposit and permitted it to be mingled with its general deposit without restriction upon its use. A depository is only created upon the bank's application in writing, accompanied by a sworn statement of the condition of the bank, which must be approved by the Treasurer. This can only be consummated through the board of directors. It is a contract between the State and the bank of which the statute is a part to the effect, among other things, that the educational fund is a special deposit, and mingling it with its general funds without restriction is the wrongful act that resulted in the conversion. Judge Redfield in a note to the case of *United Society of Shakers* v. *Underwood,* 13 Am. Law Reg. (N. S.) 211, in which he criticises that decision, states the liability of the bank and its officers in case of a special deposit, and says:

"But, as said in *Foster* v. *Essex Bank, supra* (17 Mass. 479 [9 Am. Dec. 168]), it would be a breach of trust for the bank or any of its officers to open a package left on special deposit, and whoever did or counseled such act would be responsible to the owner for such tort. And, if done by an officer of the bank for its use and benefit, there can be no doubt the bank would be responsible. * * The books all show that such officers and servants are liable to the owner of such special deposits for their own wilful acts."

Such acts, resulting in the diversion of the money, constitute the conversion.

18. Defendant now, for the first time, questions the sufficiency of the indictment, in that it does not allege that the trust company was an active depository or that it sustained any official relation to the State. The allegation is in effect that the defendants, acting for the trust company, did then and there have in their possession $288,426.87 which belonged to the State of Oregon, and was part of the educational funds of the State, deposited for the State for safe-keeping, to be returned by defend-

ants to the State of Oregon. The general rule is that, when the statute sets out what acts shall constitute the offense, it is generally sufficient in the indictment to charge the offense in the substantial words of the statute. This rule has its exception, which is, that the elements of the crime sufficient to inform the defendant of the charge he is called upon to answer should be set out. As defined in *State* v. *Dougherty*, 4 Or. 205, the indictment is sufficient if it contains such specification of acts and descriptive circumstances as will upon its face fix and determine the identity of the offense, and enable the court by an inspection of the record alone to determine whether, admitting the truth of the specific acts charged, a thing has been done which is forbidden by law. The indictment we think fully complies with this requirement. There is nothing left doubtful as to the particular acts constituting the offense. It states that the money was part of the educational fund of the State placed in defendant's possession for the State for safe-keeping, which shows a lawful possession and comes within the words of the statute. *State* v. *Lee*, 17 Or. 488 (21 Pac. 455) ; *State* v. *Sam*, 14 Or. 347 (13 Pac. 303).

19. Defendant's counsel contend that the charge against defendant was made by information filed March 6, 1908, and not by indictment, and that by the amendment of Section 18, Article VII, Constitution of Oregon, at the June, 1908, election, it is provided that no person shall be charged in any circuit court with the commission of any crime except upon indictment found by a grand jury; that such amendment operated to repeal Sections 1258 to 1264 which provide for trial upon information by the district attorney, and, there being no saving clause in the amendment to the constitution, the appellate court is by the amendment divested of jurisdiction. This question was before this court in *State* v. *Ju Nun*, 53 Or. 1, (98 Pac. 513) in which it is held that the constitutional

amendment is only prospective and does not apply to pending cases, and we adhere to that view. If, as contended by defendant, the provisions of Sections 11 and 12 of the act of 1907 operate to repeal Section 1807, B. & C. Comp., so far as there is a conflict as to the penalty, yet they only relate to acts of the Treasurer, and not to the depository, and Section 1807 is unaffected thereby, so far as it relates to the offense charged in this information.

20. Counsel again call our attention to the excessiveness of the fine, viz., $576,853.74, and upon further consideration we believe that the fine is excessive within the contemplation of the constitutional provision quoted in the opinion. The fine and the imprisonment for nonpayment thereof, adjudicated by the trial court, were within the terms of the statute and in compliance with its direct command, but we are of the opinion that, the fine being so great, it is apparently beyond the power of the defendant to pay it at this time or even during a lifetime of effort, and is such a one as is inhibited by the constitution.

The judgment of the lower court will be modified by reversing that part thereof adjudging that defendant pay a fine of $576,853.74, and that he be imprisoned in the county jail of Multnomah County, Oregon, until said fine is paid, not exceeding 288,426 days. In all other respects the judgment is affirmed.

MODIFIED ON REHEARING: AFFIRMED.

MR. JUSTICE KING delivered the following dissenting opinion.

I concur in the holding by the majority, respecting the unconstitutionality of the fine and jail sentence imposed; but, after a careful re-examination of the able briefs, and argument therein, of the respective counsel, including those on petition for rehearing, I am unable

to agree with the conclusion announced, respecting the other, and decisive, points presented. I, accordingly, record my dissent therefrom.