Argued September 21, affirmed December 29, 1914.

## STATE v. WEST, GOVERNOR.

(145 Pac. 15.)

**States—Appropriations—Funds.**

1. For the years 1911 and 1912 the legislature appropriated $142,000 for the maintenance of the penitentiary. Of this, $80,000 was spent, and the sum of $20,000 derived from sales of brick made by the convicts was deposited as a revolving fund, out of which sum $16,000 was spent for the maintenance of the penitentiary. *Held*, that, as, except in the case of school or other funds raised by special taxation, there is no segregation of moneys in the treasury, the money derived from the sale of brick made by the convicts could not be deposited in a special fund, subject to warrants drawn for penitentiary purposes, but, as the full appropriation for the penitentiary was not expended, warrants paid out of the so-called revolving fund should be treated as paid out of the appropriation for the penitentiary, and the state, not having been damaged by payments out of the so-called revolving fund, could not recover the same from the state officers making such payments.

From Marion: PERCY R. KELLY, Judge.

In Banc. Statement by MR. CHIEF JUSTICE McBRIDE.

In substance, it is stated in the amended complaint that during the period involved in this controversy the defendant West was Governor, the defendant Olcott, Secretary of State, and the defendant Kay, Treasurer

of the State of Oregon; that they assumed to act as a board purporting to have control of what they termed the "Oregon State Penitentiary Revolving Fund," consisting of rent of a foundry plant at the prison and of money derived from sales of brick made by the convicts, aggregating during that time $16,905.92; that, without the same having been appropriated by any act of the legislative assembly, they expended, of that amount, by a pretended process of auditing alleged claims and drawing warrants and payment thereof in form as if regularly appropriated, $16,518.83, without any authority of law, for services rendered, materials and supplies furnished, and land purchased for the penitentiary, all in excess of the moneys appropriated by law for any purpose connected with that institution during the period mentioned; and that the moneys actually appropriated by the legislative assembly for that purpose were otherwise expended. Alleging that the state is damaged in the sum so wrongly disbursed, the plaintiff demands judgment for $16,518.83. The allegation of damage to the state and that the payments in question were in excess of lawful appropriation therefor are denied by the answer. The official character of the defendants is admitted. All other allegations of the complaint are denied, except as stated in the answer. After alleging, in substance, that the money derived from rent of foundry and sale of brick made by the convicts had been carried in the accounts of the state treasury under the head of "Oregon State Penitentiary Revolving Fund," the answer alleges:

"That during the year 1911 large numbers of the prisoners and convicts confined at said penitentiary were employed under the direction and control of the

74 Or.—8

superintendent of said penitentiary in useful and profitable labor, as making bricks, repairing and constructing buildings and other equipment in and about said institution for the maintenance and betterment of said penitentiary, all pursuant to rules and regulations prescribed by defendant Oswald West, Governor of the State of Oregon. That, in the course of said employment of said prisoners and convicts, it became necessary to engage the services of men and to purchase the materials, supplies and land as described in the amended complaint for the more useful, profitable and efficient employment of said prisoners and convicts, and for the enlargement of their employment, and for the maintenance and betterment thereby of said penitentiary. That said services, materials, supplies and land were engaged and purchased by said superintendent for the State of Oregon for the use and benefit of said institution; that payment was made therefor in the following manner, to wit: Vouchers specifying the items for said claims were duly certified by said superintendent, and by him transmitted to defendants, who examined and approved the same and thereafter transmitted the same to defendant Ben W. Olcott, Secretary of State. Said defendant Ben W. Olcott, Secretary of State, thereafter duly audited, approved and allowed said claims and drew warrants in payment of the same on said defendant Thos. B. Kay, said warrants purporting to direct said defendant Thos. B. Kay to pay the same out of said 'Oregon State Penitentiary Revolving Fund.' Said defendant Thos. B. Kay, paid said warrants and charged the same to said 'Oregon State Penitentiary Revolving Fund.' That said rents and proceeds of said labor, inclusive of said balance of $1,006.34, aggregated in moneys from January 1, 1911, to September 3, 1912, the sum of $20,808.26. That the cost of said services, materials, supplies and land for which said warrants were drawn and paid, as alleged, aggregated $16,191.33. * * Said expenditures were found necessary in order to insure the safe custody of the inmates, promote the welfare of the said

institution, and carry out the purposes for which it was established.''

By whom it was found necessary to do all these things is not stated.

In a second defense, after stating that the legislature had appropriated for the *biennium* of 1911 and 1912, $142,000 for the salaries of officers and employees and for the general maintenance and contingent expenses of the penitentiary, the answer contains this allegation:

''That the salaries of the officers and employees and the general maintenance and contingent expenses of said penitentiary for the year 1911 over and above, and for other purposes than those expenditures described in the amended complaint, aggregated the sum of $80,375.45; and obligations were incurred and warrants drawn pursuant to said act and appropriation during the whole of said year 1911 over and above said expenditures described in the amended complaint for no other or greater sum than $80,375.45; and there was in the hands of defendant Thos. B. Kay, State Treasurer, on January 1, 1912, unexpended of said appropriated sum and over and above all warrants drawn or obligations incurred pursuant to said act and appropriation, exclusive of said expenditures described in said amended complaint, the sum of $61,624.55.''

A third defense is, in substance, that the amount paid for the services, materials, supplies and land mentioned in the complaint was the fair market price such as would have been paid for the same had there been in the hands of the State Treasurer money duly appropriated by the legislative assembly for that purpose, and that no damage was done to the plaintiff by the payments challenged by the complaint. Much to the same effect is the fourth separate defense, in substance, that the materials, land and supplies mentioned were

used in the maintenance of the state prison and for the better and more efficient conduct and management thereof. This fourth separate answer concludes with these allegations:

"That all of said matters and things in the answer alleged and set forth in the amended complaint were brought to the full notice and knowledge of the legislative assembly of the State of Oregon for the year 1913, by means of reports made to said assembly pursuant to law by defendants and by reports of investigating committees appointed for such purposes by the legislative assembly; that said legislative assembly took no action toward the repudiation of said matters, transactions or things, but acquiesced therein, and ratified and confirmed the same, and accepted all of the benefits thereof for and on behalf of the State of Oregon."

A demurrer to the new matter in the answer was overruled by the Circuit Court. The reply denied the allegation of the answer respecting the acquiescence and ratification by the legislative assembly of the acts complained of, and alleges, in substance, that a committee appointed by the legislative assembly at the session thereof held in the year 1913 expressly reported that the expenditures in question were without authority of law and illegal, and that none of them were ever acquiesced in, ratified or confirmed by the legislative assembly or by the direct vote of the people. The pleadings having been thus concluded, both parties moved for favorable judgment on the pleadings according to their respective prayers. The Circuit Court overruled the motion of the plaintiff, and sustained that of the defendants, entering judgment dismissing the action. The plaintiff appeals.

AFFIRMED.

For the State there was a brief over the names of *Mr. Andrew M. Crawford,* Attorney General, and *Mr. James W. Crawford,* Assistant Attorney General, with an oral argument by *Mr. Andrew M. Crawford.*

For respondents there was a brief with oral arguments by *Mr. John H. McNary* and *Mr. Claude Mc-Colloch.*

Opinion by Mr. Chief Justice McBride.

The answer of the defendant contains many conclusions of law and some inconsistencies. From all the pleadings it appears that there came into the hands of the State Treasurer from sales of brick and other products of the state penitentiary during the *biennium* of 1911 and 1913 the sum of $20,808.26, which, under the direction of the board, was charged in a separate account as a revolving fund, of which $16,191.33 was paid out by warrants drawn upon it for expenditures "found necessary in order to insure the safe custody of the inmates, promote the welfare of the institution, and carry out the purposes for which it was established." It also appears that, for the support and maintenance of the institution, the salaries of officers and employees, and for the general maintenance and contingent expenses of the penitentiary, the legislature appropriated $142,000, of which there was expended $80,375.45 over and above the sum of $16,191.33, before mentioned, making up a total expenditure for the biennial period of $96,566.78. There is no authority of law for creating this so-called revolving fund, and therefore it did not legally exist. The moneys paid into the treasury from the proceeds of materials manufactured at the penitentiary became legally part of the general funds in the state treasury, and the attempt to

maintain and draw warrants upon this so-called re-
volving fund was not authorized by law.   Except in
the case of school funds and other funds raised by
special taxation and authorized by law for a particular
purpose there is no segregation of moneys in the
treasury.   As to moneys appropriated by the legisla-
ture out of the general funds of the state, the separa-
tion and designation of the particular sums appro-
priated as "funds," such as "penitentiary fund,"
"asylum fund," etc., is largely a matter of bookkeep-
ing, and is done for convenience in ascertaining when
the amount appropriated has been exhausted.   The
amount, therefore, designated by the state's book-
keeper as the "revolving fund" was, in fact, a part
of the general funds of the state, and subject to be paid
out upon any warrant presented against any so-called
fund the amount of which had not been exhausted.   It
was a mistake, therefore, to designate warrants drawn
for the maintenance of the penitentiary as drawn upon
the so-called revolving fund and payable out of it.
Technically speaking, they should have been drawn
upon what was known on the books of the treasurer
as the "penitentiary fund"; but, so far as the state
is concerned, except for some confusion in bookkeep-
ing which might, but in this case did not, lead to war-
rants in excess of the amount appropriated by the legis-
lature, the result is exactly the same as though the
warrants had been drawn against that portion of the
general funds of the state designated for the purposes
of bookkeeping "the penitentiary fund."   This is too
plain for argument.   It is admitted that the expendi-
tures made were for the maintenance of the penitenti-
ary's legitimate indebtedness.   For that purpose any
money which came into the state treasury and was
otherwise unappropriated could be drawn upon so long

as the amount did not exceed $142,000. This $16,-
191.33 did come into the state treasury, and was not
otherwise appropriated, and could therefore be legiti-
mately used, along with any other money in the treas-
ury, to answer the demands caused by expenditures
at the penitentiary. Had the amount of $142,000 ap-
propriated by the legislature been first consumed, and
this $16,191.33 been used in addition to that, the state
would have been damaged, but it is an admitted fact
that only $96,566.78, including the amount drawn from
the revolving fund, was drawn altogether, leaving a
balance of $45,433.22 to be returned to the treasury.
To say that the state has been damaged in any respect
by the irregular manner in which the warrants were
drawn and paid is to ignore plain facts and figures
which speak for themselves.

The judgment of the Circuit Court is affirmed.

AFFIRMED

MR. JUSTICE BURNETT delivered the following dis-
senting opinion:

It is laid down in Section 79, L. O. L., that:

"At any time when the pleadings in the suit or ac-
tion are complete, or either party fails or declines to
plead further, the court may, upon motion, grant to any
party moving therefor, such judgment or decree as it
may appear to the court the moving party is entitled
to upon the pleadings."

The object of this section was to confer upon the
court a power hitherto deemed to be doubtful, to de-
clare the proper judgment to be deduced from uncon-
troverted allegations.

Taking all the pleadings together, it appears in this
case a certain fund accrued to the State of Oregon
from the sources mentioned. It is admitted that the

defendants treated this fund as if the same had been regularly appropriated by the legislative assembly for the expenses connected with the maintenance of the penitentiary, and, under the forms of law prescribed for the disbursement of the actual appropriation, they disbursed the same in addition to and beyond the fund created for the purpose by the legislative assembly. The only substantial difference between the parties on the facts is that the plaintiff charges the expenditure of $16,518.83, for which it demands judgment, while the defendants only concede the payment of $16,191.33.

Article IX, Section 4, of the State Constitution declares that:

"No money shall be drawn from the treasury but in pursuance of appropriations made by law."

It is said also in Article III of the same instrument that:

"The powers of the government shall be divided into three separate departments—the legislative, the executive, including the administrative, and the judicial; and no person charged with official duties under one of these departments shall exercise any of the functions of another except as in this Constitution expressly provided."

It is thus clearly apparent that the appropriation of public funds is a legislative function; for they are only to be "made by law," Neither of the defendants is vested with any legislative authority. The limit of their power in the expenditure of public funds is, and must be, defined by the utterances of the legislative department. To admit a contrary principle would open the doors to unlimited extravagance in the administration of public affairs. It is for this reason that the people reserved to themselves, through their representative in the legislative assembly, the exclusive

right to limit the disbursement of money belonging to
the state. When, therefore, the defendants assumed
to pay out state funds without the same having been
appropriated by an act of the legislative assembly,
they did so without any authority, and can claim noth-
ing on account thereof. As stated by Mr. Justice
EAKIN in *State* v. *Ross,* 55 Or. 450 (104 Pac. 596, 106
Pac. 1022, 42 L. R. A. (N. S.) 601, 613), in discussing
conversion of public money:

"We understand from these authorities, and many
others we have examined, that, in relation to trover,
the term 'conversion' necessarily means conversion to
one's own use, and is fully accomplished by any exer-
cise of a dominion over a chattel without the authority
of the owner, whereby the true owner is deprived of
the enjoyment of his chattel. And it is wholly imma-
terial whether the person so converting did it for his
own personal advantage or not."

It is urged by the defendants, in substance, that it
was necessary that these expenditures should be made,
but our attention has not been directed to any statute
declaring such necessity. It was manifestly only the
judgment of the defendants that the same was neces-
sary. In this they usurped the legislative prerogative.
It is stated also that by receiving the benefit the state
has ratified the act. Such a principle is well applicable
to transactions between private parties and their
agents; but, in the absence of any authentic exercise of
the legislative power, ratification does not attach. The
only actors in the transactions mentioned are the de-
fendants themselves, who are the official servants or
agents of the people within the respective powers con-
ferred upon them by the Constitution and laws of the
state. It cannot be said that the defendants may per-
form acts contrary to and in excess of their official

authority, and at the same time ratify them on behalf
of the state. It cannot be admitted that official mal-
feasance is self-sustaining. Ratification is an act that
can·be performed only by a principal. Even if the
same could be applied in this case, it is a function not
attributable to, nor to be exercised by, the agent whose
acts are in question. ·The principles applicable to the
expenditure of public funds are exemplified in *Shat-
tuck* v. *Kincaid,* 31 Or. 379 (49 Pac. 758); *Boyd* v.
*Dunbar,* 44 Or. 380 (75 Pac. 695); and *Calbreath* v.
*Dunbar,* 46 Or. 580 (81 Pac. 366).

In short, the pleadings show that the defendants,
without authority of law, have expended from the state
treasury some amount of money, or, in other words,
have converted that amount of money to their own use
within the meaning of *State* v. *Ross,* 55 Or. 450 (104
Pac. 596, 106 Pac. 1022, 42 L. R. A. (N. S.) 601, 613).
The measure of damages in a case of conversion is the
value of the property converted, and the only legal
way in which the matter can be adjusted is to require
the defendants to replace the money which they have
unlawfully disbursed.

The legislative assembly of 1911 passed a law to
provide for the payment of the maintenance, improve-
ments, buildings, equipments, betterments and repairs
at the Oregon State Insane Asylum, Oregon State Peni-
tentiary and other state institutions named in the title
of the act, and for such other purposes and items of
expense as in that statute were expressly enumerated:
Laws 1911, c. 183. Section 1 of the enactment begins
by stating that:

"The following sums, or so much thereof as may be
necessary and no more, are hereby appropriated out of
the moneys in the general fund in the state treasury

not otherwise appropriated, for the several objects and
purposes hereinafter named, for the two years com-
mencing on the first day of January, 1911, and ending
on the thirty-first day of December, 1912.''

Among other items it then makes the following ap-
propriations:

For the payment of the salaries of the officers
    and employees, and for the maintenance
    and general and contingent expenses of
    the Oregon State Penitentiary .........$142,000
For the payment of the expenses of purchas-
    ing material, etc., for new roof over cell-
    house at the Oregon State Penitentiary..   3,000
For the payment of the expenses of purchas-
    ing material and for labor replumbing old
    cells, wiring cells for electric lights, and
    rewiring cell-houses, offices and guards'
    quarters, at the Oregon State Penitenti-
    ary.... ................................   2,000
For the payment of the expenses of purchas-
    ing two 1,000 gallon (each) automatic air-
    tanks for the Oregon State Penitentiary   1,500
For the payment of the expenses of purchas-
    ing pump and connections conducting
    water to the Oregon State Penitentiary..    450
For the payment of the expenses of purchas-
    ing material for repainting cells, houses
    and other buildings at the Oregon State
    Penitentiary ...... ....................    800
For the payment of the expenses of purchas-
    ing material for repairing stock barns
    and other out buildings at the Oregon
    State Penitentiary ....................    250
For the payment of the expenses of making
    necessary repairs and maintaining pump-
    ing plant at Oregon State Penitentiary..   1,200
For the payment of the expenses of making
    repairs, etc., to the hospital at the Oregon
    State Penitentiary ....................    500

For the payment of expenses of making in-
cidental repairs, etc., at the Oregon State
Penitentiary ......... ...............        300
For the payment of the expenses of purchas-
ing and installing 24 new steel cells at the
Oregon State Penitentiary ............        11,250

For purchasing supplies to be sold to convicts    1,000

These expressions of the legislative will, about
the necessity of expending public moneys and the ex-
tent thereof are paramount to the judgment on that
subject of any officer in the administrative department
of the government.   If that were a judicial question,
actual damage to the state and its people could well be
predicated upon unauthorized and extravagant dis-
bursement of public money, and the standard by which
such damage should be estimated is found in the stat-
ute providing for the expenses of the public service.

The essence of the second defense is that out of the
funds appropriated by law the defendants have paid
out $80,375.45, and that they have on hand $61,624.55,
making the total appropriation of $142,000.   They ex-
pressly avow that they made the expenditures described
in the complaint to the amount of $16,191.33 outside
of and in addition to the money appropriated by law.
If the transaction had been regular as measured by
the appropriation, their account would be stated sub-
stantially thus:

To amount of appropriation............$142,000.00
Contra credit ...............$80,375.45
By revolving fund paid out... 16,191.33        96,566.78

$45,433.22

The defendants, however, explicitly aver that they
still have on hand an unexpended balance of the legis-
lative allowance in the sum of $61,624.55.   The math-
ematical deduction is that the $16,191.33 was money

they were not authorized to disburse, and when they allege they still have $61,624.55, we cannot rightly say they have only $45,433.22, and thus cover up the unauthorized payment in face of their own answer.

But they say, in substance, that they paid fair prices, and the state got the worth of its money. To uphold such business, in the absence of any legislative validation, is to allow an administrative officer to substitute his own judgment for that of the legislative branch of the government and pay out public money in his hands in any manner or for any purpose finding favor in his sight. In this case it seems that the defendants have profitably operated a state institution on state capital, and claim the right to expend the gains in enlarging the business, unhampered by legislative appropriation. This is a palpable invasion of the lawmaking prerogative and constitutionally cannot be upheld.

If the legislative assembly had deemed it wise or prudent to make the expenditures in question, it probably would have made appropriations out of the general fund for those items, but, not having done so, it is not within the constitutional power of either the administrative or the judicial department of government to make such payments or to sanction them after they are made. Whether we consider the source from which the money was obtained or the objects to which it was applied, the transaction is equally in excess of the authority conferred by the legislative assembly. That body prescribed in detail, as stated above, the amounts of money apropriated and for what it was to be expended, and that is the limit of the defendant's authority. All in excess of that constitutes conversion of public funds for which they should be held responsible on their own answer.

The allegations in the answer properly might be addressed to the legislative assembly as an argument for increased appropriation in the first place or for a relief bill in the interest of the defendants in the present juncture, but, as those averments involve legislative functions beyond the power of this court, they ought not to be regarded here. There being at least an undetermined issue as to the amount of money expended in excess of the appropriation, we cannot render judgment upon the pleadings. The Circuit Court, however,. was in error when it overruled the demurrer to the new matter in the answer, and also was mistaken in deciding for the defendants on the case stated.

For these reasons, the judgment should be reversed, and the cause remanded to the Circuit Court for further proceedings.

MR. JUSTICE MOORE and MR. JUSTICE EAKIN concur in this dissent.