An unauthorized deposit, with the knowledge of the *Page 135 
bank receiving same, is held in trust and may be rescinded by the owner and recovered. Uniform Fiduciaries Act, sec. 9 (sec. 2993 N.C.L.). While not expressly declared void, as was explained in Organ et al. v. Winnemucca State Bank et al., 55 Nev. 72,26 P.2d 237, and Leach v. Armstrong, 52 Nev. 125, 283 P. 396, the deposits made by the commission were clearly unauthorized, either as general or special deposits, and relief can be had on this showing, whether the state appears to be transacting business or administering government. Leach v. Armstrong supra.
An unauthorized deposit never becomes a general deposit. It may be rescinded and denounced and recovered back by the owner in full. Patek v. Patek (Mich.), 131 N.W. 1101; 35 L.R.A. (N.S.) 461, and notes; Andrews v. Farmers Trust Co. (Mo.App.),21 S.W.2d 641.
A purported deposit by a fiduciary, without authority of law, or contrary to law and without the consent of the owner, express or implied, and to the knowledge of the bank, is taken out of the category of a general deposit and becomes a special deposit and trust fund to be rescinded, denounced, and recovered back in full by the owner. Yellowstone County v. First Trust Savings Bank (Mont.), 128 P. 596; Brogan v. Kreipe (Kans.), 227 P. 261; Tooele County Board of Education v. Hadlock (Utah), 11 P.2d 320-329; Allen v. United States (C.C.A. 1st), 285 Fed. 678; State v. Thum (Ida.), 55 P. 858; State v. Bruce (Ida.), 102 P. 831; Montgomery v. Sparks (Ala.), 142 So. 769; State v. Ross (Ore.),104 P. 596-600; Re Fidelity State Bank (Ida.), 209 P. 449; Leach v. Farmers Sav. Bank (Iowa), 216 N.W. 748; Tucker v. Newcomb (C.C.A. 4th), 67 F.2d 177; Compton v. Farmers Bank, 279 S.W. 746; Zydek v. First State Bank of Wilkeson (Wash.), 30 P.2d 654; American Surety Co. v. Jackson (C.C.A. 9th), 24 F.2d 768; Board of Township Trustees, etc., v. Gray, 47 Ohio App. 216,191 N.E. 802; State ex rel. Gentry v. Page Bank, 14 S.W.2d 597.
A bank is charged with notice of a public statute as *Page 136 
to authority to make a deposit. State ex rel. Gentry v. Page Bank, supra.
A deposit wrongfully made, with the bank's knowledge, creates a trust. State v. Ross, supra.
A contract of deposit is governed by the law existing at the time it is made. State v. Ross, supra; In re Fidelity State Bank, supra; Cochrane v. Pacific States Life Ins. Co. (Colo.),27 P.2d 196.
When the state is the owner, an unauthorized deposit is not converted into an authorized general deposit by reason of any practice or construction of the governing law by any officer, agency of the state, or commission, when the law is not doubtful. There is no estoppel. The evidence does not show any knowledge or ratification of any purported general deposits made by the commission in the Carson Valley bank, by the state or any officer of the state. The treasurer and the governor had nothing to do with them. The commission is not a part of the state government. Only when a doubt exists as to the proper construction of a statute will courts give weight to the construction placed thereon by coordinate branches of the government. State v. Brodigan, 35 Nev. 35 at 39, 136 P. 680-682; State v. Claypool (Ore.), 28 P.2d 882; State v. Davies (Wash.),28 P.2d 322-326; Austin v. Barrett (Ariz.), 16 P.2d 12-14.
An express contract, governed by law and referring to specific law, setting out and referring to a specific purpose, identifying the subject matter as a trust fund and stating, or by reference to law disclosing, the powers of or limitations upon the depositors, distinguishes the deposit from a general deposit. These principles apply in the disjunctive as well as in the conjunctive. A general deposit represents the general rule. All other deposits are exceptions to the general rule. Michie on Banks and Banking, vol. V, pp. 624, 625; Montana-Dakota Power Co. v. Johnson (Mont.), 23 P.2d 956-958; Pethybridge v. First State Bank (Mont.), 243 P. 569, syllabus 2; McStay Supply Co. v. Stoddard, *Page 137 35 Nev. 284, 297, 132 P. 545; 7 C.J. (Banks and Banking), p. 630, sec. 306, p. 631, sec. 307; City of Sturgis v. Meade County Bank (S. Dak.), 161 N.W. 327; Gray v. Elliott (Wyo.), 257 P. 345; Hitt Fireworks Co. v. Scandinavian-American Bank (Wash.),195 P. 13-15, 196 P. 629; 3 R.C.L., "Banks," 517; 26 R.C.L. 1237-1238.
It needs no special evidence, aside from the fact that the funds were deposited, to draw the indisputable inference and implication that by law and practice these funds were always understood between the state and the bank to be general deposits. In the first place, in accordance with the law under which the deposits were made, the bank was obligated to pay interest. If the deposit were segregated and set aside as a special deposit, not only would the bank have had no opportunity to invest it, but it could not possibly, as a matter of business, pay any interest on it. The conclusion at once is irresistible that the funds were intended to be mingled along with the funds of other depositors, to be used by the bank as it saw fit. If this were not the understanding, the bank could not possibly have obligated itself to pay any interest at all. This was undoubtedly in contemplation of the lawmakers when they enacted the legislation authorizing the industrial commission to make the deposits. The act characterized the nature of the deposits, but by the very terms of the act practically each of these deposits contemplated a specified interest-bearing percentage. No law of this character could be enacted without disclosing an intention upon the part of the legislators that the deposits were to be general, and that the bank was to have the use of the funds deposited in order to make the interest payments fixed by law. Aside from the interest-bearing features of the statute (sec. 2721 N.C.L.), which would require a bank to commingle the funds with other deposits and invest the same in order to pay interest, it is evident *Page 138 
from this and other state legislation that the policy of the state with respect to moneys in the state treasury is, and has been, to cater to the banks and permit them to use certain of the state's money for investment or such benefits as may come to them. In fact, the legislature of Nevada has gone so far as to enact a statute authorizing the state treasurer to deposit in open accounts and subject to check without notice. Sec. 7030 N.C.L. While these deposits on open account may only be made through the written consent and approval of the state board of examiners, and while all funds deposited must be secured by good and sufficient bonds, yet it is very evident that not only general legislation, but specific legislation affecting any particular fund, contemplated that the bank should have the use of the state's money as provided by statute, that the bank should pay interest to the state for the money used, and that in no instance, either through general or specific legislation, was the state treasurer, as custodian of the state's funds, commanded and unequivocally directed to open special accounts.
The exaction by the state of a surety bond covering the deposit of its funds is a waiver by the state of whatever sovereign prerogative to payment ahead of other depositors the state might have had. Maryland Casualty Co. v. Rainwater,291 S.W. 1003, 51 A.L.R. 1332; National Surety Co. v. Pixton (Utah), 24 A.L.R. 1486, at 1494; In re Central Bank of Wilcox (Ariz.),205 P. 915; Smith v. Arnold, 165 Ky. 214, 176 S.W. 983; National Surety Co. v. Morris (Wyo.), 42 A.L.R. 1290, at 1296. And, as conclusive on this contention, see State et al. v. Carson Valley Bank, 55 Nev. 26, 23 P.2d 1105.
In addition to the authorities hereinabove cited, under the great weight of authority, the deposits in controversy in both cases were general deposits and not special. 7 C.J., secs. 628, 630; Michie on Banks and Banking, vol. 3, p. 253, sec. 184; Keys v. Paducah I.R. Company, 61 F.2d 611, 86 A.L.R. 203.
Further, the "custom of banks," of which the court takes judicial notice, establishes that the deposits were *Page 139 
general and not preferred. Montana-Dakota Power Co. v. Johnson,23 P.2d 956.
It is immaterial what appellants or the commission or the state treasurer may call or name the agreement entered into with the banks, as the controlling principle is as to how the commission or state treasurer and the banks, together with the state authorities, treated the contractual relation. Stockton Savings Loan Soc. v. Purvis, 44 P. 561; Page on Contracts, vol. 4, p. 3524. The intention of the parties, gathered from the manner in which the parties treated the deposits and accounts for a long number of years, establishes conclusively that the word "special" was not employed in the agreements for the purpose of segregating and separating and not commingling the moneys in the accounts and deposits to establish them as strictly special accounts.
 OPINION
This is an appeal from a decree in two cases brought in the First judicial district court of the State of Nevada, in and for the county of Ormsby, one case being State of Nevada and George B. Russell, as state treasurer of the State of Nevada, plaintiffs, against Carson Valley bank, a Nevada banking corporation, and E.J. Seaborn, as superintendent of banks of the State of Nevada, and J.H. Stern, S.C. Durkee, and S.C. Bigelow, for themselves and other depositors in said bank similarly situated, defendants, the other case being the same plaintiffs against United Nevada bank, a Nevada banking corporation, and E.J. Seaborn, as superintendent of banks of the State of Nevada, and John Granata and Robert M. Price, for themselves and all other depositors in said bank similarly situated, defendants; thereafter in both actions Leo F. Schmitt, as receiver of each of said banks, was substituted as successor to the defendants. *Page 140 
These actions were joined upon the trial and by and through stipulation were also joined upon the appeal.
Upon the oral argument in this court, the appellants expressly disclaimed any right of preference for these amounts or either of them by reason of the sovereign right of the State of Nevada to claim such preference right, but contends that the $65,000 is entitled to preference as special and/or specific deposits, and the $119,747.64 as a trust fund and entitled to preference.
All these funds were moneys collected by the Nevada industrial commission in the course of its activities as such under the laws of this state known as the Nevada industrial insurance act and belonged to what, under the law, is known as state insurance fund.
We first consider the deposits amounting to $65,000 and later will consider the other deposits of $119,747.64.
Four deposits of various amounts aggregating $55,000 had been made by the state treasurer of Nevada in the Carson Valley bank upon what were called, one "a special deposit," and three "special deposits" all bearing interest at 3 percent per annum. As each of these deposits were made, county and municipal bonds of certain taxing units of Nevada were deposited by the Carson Valley bank with the state treasurer as security for the return and repayment of such deposits to the state treasurer, the first one at the end of a period of six months, the other three upon written demand.
All these deposits were made pursuant to an order of the Nevada industrial commission and pursuant to section 40 of the Nevada industrial insurance act (Stats. 1913, c. 111, sec. 40, as amended by Stats. 1915, c. 190, sec. 12), except that whereas said section 40 required "a good and sufficient surety deposit bond," the county and municipal bonds were deposited with the state treasurer instead; at a later date and subsequent to all these deposits, "surety deposit bonds" were furnished by the bank to the state treasurer and the said county and municipal bonds were returned to the bank.
The bank closed its doors, finally landed in the hands of receiver Schmitt, the present defendant herein, and *Page 141 
the surety bond or bonds given are worthless on account of the insolvency of the surety company.
As to the United Nevada bank transaction, the state treasurer deposited $10,000 as a "special time deposit" for the period of one year or until demand is made therefor, under an order of the Nevada industrial commission based upon the bank giving a surety bond of the Nevada Surety Bonding Company and pursuant to said section 40 of the insurance act, as amended by Stats. 1919, c. 176, sec. 7. The bank was to pay 4 percent per annum upon this deposit. At the time of this deposit, a written agreement was entered into between the bank and the Nevada industrial commission in which this deposit was designated a "time loan for the period of one year from date, or at any date thereafter on demand of the Nevada industrial commission."
The Nevada Surety Bonding Company giving the above bond is now insolvent, and the bank is now in the hands of the defendant receiver.
All these deposits stand on the same footing and will be all treated together.
Interest was paid upon these deposits as stipulated at each interest payment date until the banks were closed.
Demand has been made upon the banks since they have been in the hands of the superintendent of banks and the receiver for the return of all said funds so deposited and that each of said deposits be treated and held to be special deposits to be paid in full, but they have been denied as special deposits and accorded only the status of general deposits.
Suits were brought in the proper district court to have these deposits declared special deposits and entitled to preference and paid in full. Decree was for the defendant, and from this decree, this appeal was taken.
If the contention of plaintiffs is right, the entire sums deposited become preferred claims with preference over all general claims and entitled to first payment from the assets of the banks.
There are but two kinds of bank deposits, special and *Page 142 
general. A special deposit is one in which funds are deposited for a special purpose and the identical funds returned to the depositor or paid to other particular persons designated by the depositor and the relation of bailee and bailor arises between the bank and the depositor and not the relation of debtor and creditor; all other deposits are general and between the bank and its depositor the relation of debtor and creditor exists with no preference of payment to the creditor.
These deposits were made many years ago, those in the Carson Valley bank being made in July, 1915; August, 1916; July, 1917; and August, 1917, and that in the United Nevada bank in June, 1930.
The Carson Valley bank deposits draw interest at 3 percent per annum and the United Nevada bank deposits draw interest at 4 percent per annum.
There is no contention and no question raised that any of these deposits were illegal or unauthorized, and they appear to have been made in accordance with the law in force and effect at that time, the question being, Were they special deposits as designated in the certificates of deposit issued by the banks at the time the deposits were made?
Section 8 of the Nevada industrial insurance act, as amended by Stats. 1915, c. 190, sec. 3, provides that on and after April 1, 1915, the administration of the act was imposed upon the Nevada industrial commission, consisting of three members appointed by the industrial commission board, which is and was composed as follows: The governor, attorney-general, and inspector of mines.
Section 40 1/2 of that act, as added by Stats. 1917, c. 233, sec. 10, makes it the duty of the industrial commission board to make an audit of all books of account and records and of the funds of the Nevada industrial commission annually or as often as they may deem necessary.
1-5. This court will take judicial notice that since at least the deposits were made in the Carson Valley *Page 143 
bank, the state treasurer, the governor, and the personnel of the Nevada industrial commission and the industrial commission board have from time to time been changed and others have taken the place of those retiring.
These deposits, however, have remained unchanged and the interest thereon as designated in the certificates of deposit has been paid to and received by the state insurance fund officers having the care and custody of that fund.
The state can only act through its duly elected and appointed officers and their actions when authorized by law constitute the actions of the state. Those officers know and must be charged with the knowledge of these deposits as in the performance of their duties they must have investigated where the state funds were kept and secured.
The Carson Valley bank deposits of the funds in question were first secured by bonds and later they were withdrawn and surety bonds given in lieu thereof.
Banks may give security for deposits only when by law they are expressly permitted to do so and at the present time national banks can only give security for deposits in those states whose laws permit state banks to do so.
The laws of Nevada require all banks, both state and national, to give security for all state and all such public deposits.
This security is not that the identical money shall be returned when it shall be demanded, but that repayment shall be made upon demand and without loss to the state or other public depositors.
The law requires that interest shall be paid on such deposits and it is not to be conceived that the law would require the payment of interest upon dead funds lying idle year after year in the bank with no chance for the bank to make an investment sufficient to earn such interest. The security is to guard against bad investments which may endanger the safety of the deposit. *Page 144 
It always has been the policy of governments to keep money in circulation rather than to have it hoarded and kept out of circulation.
The contention is made that these deposits were made for a special purpose, the payment of claims of those injured in the industrial pursuits of the state. That is true in that all funds belong to the state insurance fund created and are collected for that purpose.
All these deposits, with the single exception of the United Nevada bank deposit, were made under the 1915 session amendment, chapter 190, section 40, subsection (c), which reads as follows: "The state treasurer may, upon written authority of the Nevada industrial commission, approved by the governor, deposit an additional fifteen per cent of said fund in bank or banks in the State of Nevada upon special time deposits bearing interest at not less than three per cent per annum; provided, however, that such bank or banks in which deposits may be made shall give to the Nevada industrial commission a good and sufficient surety deposit bond guaranteeing said Nevada industrial commission against any loss of said deposit by reason of failure, suspension, or otherwise of said bank. Interest earned by such portion of the state insurance fund which may be deposited in any bank or banks, as herein provided, shall be placed to the credit of the state insurance fund."
Before this amendment, section 40 read as follows: "The State of Nevada shall not be liable for the payment of any compensation under this act, save and except from the said state insurance fund, to be derived from the payment of premiums as provided in this act." Laws 1913, c. 111.
Section 24 of that act is as follows: "All premiums provided for in this act shall be paid to the state treasurer, and shall constitute the state insurance fund for the benefit of employees of employers and for the benefit of dependents of such employees, and shall be disbursed as hereinafter provided."
The first attempt of the legislature of Nevada to enact *Page 145 
a workmen's compensation law was the act of March 24, 1911, page 362 (chapter 183), which was very brief and provided for arbitration of claims for injuries when the parties interested were unable to agree.
In 1913 this act was repealed and the original act which we now have was enacted, and was approved March 15, 1913, page 137 (chapter 111).
Section 24 of that act remains today as then enacted and as quoted above.
The case State v. McMillan, 36 Nev. 383, 384, 136 P. 108, held the state insurance fund was a special fund given to the state treasurer in trust as distinguished from state taxes and other revenues of the state.
The legislature by the "Nevada Industrial Insurance Act" has seen fit and proper to direct how the state insurance fund shall be safeguarded and protected and has provided, as we see in section 40, as amended and set forth as above, to provide for a portion of that fund to be deposited in bank or banks.
The only security required is that the bank receiving such a deposit shall furnish a "good and sufficient surety deposit bond guaranteeing said Nevada industrial commission against any loss of said deposit by reason of failure, suspension, or otherwise of said bank."
No further requirement was provided for, no provision that the bank should hold it as a trust fund, no provision that it should be a preferred claim on the assets of the bank, nothing to indicate that the state would exercise a "sovereign right" of preference, only the requirement that it should be a "special time deposit."
There are many kinds of special deposits. We must give meaning to all words used in a statute, and, consequently, by the use of the word "time" we must understand that the deposit is to be made for some period of time.
It must be a special deposit, but the limitation that it must be a time deposit bearing interest and secured by a surety bond takes it out of that class of special deposits which are generally known as such. It is a *Page 146 
special deposit in that it bears interest and its repayment without loss secured by a surety deposit bond. Those are the special conditions upon which the deposits of the state insurance fund can be made in banking institutions.
The United Nevada bank deposit of $10,000 made in June, 1930, was made at a time when the amendment of 1919 was in force and effect, and in which section 40, subsec. (c), had been amended to read as follows: "The state treasurer may, upon written authority of the Nevada industrial commission, approved by the governor, deposit twenty-five (25%) per cent of said fund in a bank or banks in the State of Nevada, fifteen (15%) per cent thereof to be deposited in open accounts bearing interest at not less than three (3%) per cent per annum, and ten (10%) per cent thereof to be deposited in time accounts, bearing interest at not less than four (4%) per cent per annum."
Then follows provision for a good and sufficient surety deposit bond as set out in the former subsection. Statutes 1919, c. 176, pp. 305, 311.
No condition as to the deposits at 4 percent except the giving of a surety bond and which we find has been given.
From the many cases cited in the briefs of counsel or referred to in the cases cited, we may well apply the following: "Special circumstances must exist in order to make the deposit special instead of general, and, inasmuch as equality is equity, courts have been careful to limit the number of special circumstances which will create a special instead of a general deposit. At the risk of repetition, we might again point out that three exceptions only to the rule that a deposit will be treated as a general were recognized in City of Sturgis v. Meade County Bank,38 S.D. 317, 161 N.W. 327, namely: (1) Where money or other thing is deposited with the understanding that that particular money or thing is to be returned to the depositor; (2) where the money or thing deposited is to be used for a specifically designated purpose; and (3) where the deposit itself *Page 147 
was wrongful or unlawful. Gray v. Elliott, 37 Wyo. 4, 257 P. 345,346, 53 A.L.R. 554.
There is nothing to indicate in the present case that the identical money deposited was to be returned, nor that it was to be used for a specific purpose, nor that it was wrongful or unlawful.
In fact, as we have seen, the deposits were made in accordance with the law and as authorized by the law, and we fail to find one single element which makes these deposits anything but general deposits and not entitled to any consideration except as such general deposits.
6. That the various certificates of deposit designate them as special deposits do not make them such, but their true character must be found in the acts and intentions of the parties. Stockton Savings Loan Soc. v. Purvis, 112 Cal. 236,44 P. 561, 53 Am. St. Rep. 210.
7. As to the deposits in the Carson Valley bank amounting in the aggregate to $119,747.64, appellants present a different question and claim this amount was unlawfully deposited in the bank contrary to law in that it belonged to the state insurance fund and should have been turned over to the state treasurer and by him kept in accordance with our laws.
This sum, with the exception of $2,805.95, was made up of moneys paid to the commission by various persons as premiums or from other sources of revenue to which the commission was entitled and covered such receipts for a period of two and one-half months.
Section 21 of the Nevada industrial insurance act, as amended by Stats. 1925, c. 114, sec. 3 (section 2702 N.C.L. 1929), provides that: "Every employer electing to be governed by the provisions of this act * * * shall * * * as required by the Nevada industrial commission, pay to the Nevada industrial commission, for a state insurance fund, premiums in such a percentage of his estimated total pay-roll for the ensuing two months as shall be fixed by order of the Nevada industrial commission. * * *"
Thereafter this section provides that the employer *Page 148 
must pay the premium on his actual pay roll on or before the 25th of each succeeding month to the Nevada industrial commission.
Section 24 of this same act (section 2705 N.C.L. 1929) provides as we have seen (supra) that: "All premiums provided for in this act shall be paid to the state treasurer, and shall constitute the state insurance fund. * * *"
By these sections the law provides that the premiums shall first be paid to the Nevada industrial commission and by the commission paid to the state treasurer to constitute the state insurance fund.
All disbursements from the state insurance fund shall be paid by the state treasurer upon warrants or vouchers of the Nevada industrial commission, authorized and signed by any two members of the commission. Section 40, subsection (a) of the act, as amended (section 2721 N.C.L. 1929).
The evidence shows and is uncontradicted, that beginning in 1913 the Nevada industrial commission received its payments of premiums from employers electing to come under the act in personal checks drawn by the employer on their individual bank accounts, or that such premiums were generally paid in that manner; that the state treasurer could not or would not receive such payments in that form, but must have cash payments; that the commission then opened an account with the Carson Valley bank and deposited all its receipts in whatever form they might be in its open running account with said bank, the bank giving credit to the commission for the items thus deposited and charging back to the commission such items as had been dishonored by nonpayment when presented for payment, all in the usual course of commercial banking business and just such a course of business as carried on in its ordinary deposit accounts; at stated times, usually monthly periods, statements of the account were rendered to the commission showing the condition of the account, just as in its ordinary and usual course of business; that this account was carried in the name of the Nevada *Page 149 
industrial commission; that checks were drawn payable only to the state treasurer for transfer to the state insurance fund.
At first all amounts over $5,000 were turned over to the state treasurer, then finally this amount was increased to $50,000, and the bank was requested to give a surety bond to the commission as security for such deposit, and this bond was in full force and effect at the time the bank closed its doors and ceased to do business.
These retentions of the funds were all in accordance with resolutions passed by the Nevada industrial commission and copies furnished to the Carson Valley bank.
Section 24 of the act does not require an immediate payment of these funds to the state treasurer, and it is not to be presumed that it was the intention of the legislature that these payments should be other than at reasonable times, and we cannot hold that the times shown for such retention was unreasonable as the evidence shows that payments of large amounts would come in which would increase the amount in this account far beyond the amount named in the various resolutions; these checks for large amounts must first be presented and paid by the bank upon which they were drawn, the bank acting as a clearing house for these payments.
No other way for the payment of these receipts was open to the commission except to require their payment in cash, an unusual, unsatisfactory, and a very inconvenient method of payment.
This course of action by the commission must have been known to the state and through these many years have been ratified and approved by the state. As we have stated before, the state can only act through its duly constituted officers, and the governor, attorney-general, and the state mine inspector compose the industrial commission board, section 8(a), and the board shall make an audit of all books of accounts and records and of all funds and securities of the Nevada industrial commission, section 40 1/2, and they *Page 150 
have the power to remove any commissioner for inefficiency, neglect of duty, or misconduct in office, section 8(b).
It is presumed "that official duty has been regularly performed." Statutes 1931, c. 50, sec. 558g, subsec. 15.
Knowing what has been the course of handling these funds by the commission and by law being the agents and representatives of the state and the only ones authorized to act in such matters on behalf of the state and taking no action to disapprove such course by removing the members of the commission, we hold that the State of Nevada through its proper officers have consented to and approved such deposit.
We therefore hold such deposits were not unlawful and did not create a trust fund in favor of the state and are only entitled to be treated as a general deposit, and entitled to no preference over other general deposits.
8. As to the item of $2,805.95, this was a working fund deposited for convenience and used for payment of minor items. While it has not been authorized by law, it has not been prohibited by law and has been so used for many years with knowledge and approval of all parties concerned in the administration of the Nevada industrial insurance act.
We hold that it is a general deposit and entitled to no greater preference than any other general deposit in the bank.
We have read with a great deal of care the able opinion of the district judge of the lower court and the able briefs of counsel and the many cases cited.
To analyze these many cases would extend this opinion beyond reasonable limits.
The decision of the lower court in both cases is hereby affirmed.
NOTE — TABER, J., having disqualified himself, the Governor designated Hon. J.M. LOCKHART, Judge of the Seventh Judicial District, to sit in his stead. *Page 151